UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>　　　　　　　　Plaintiff,<br><br>v.<br><br>ANTONIO VELASCO-ESPARZA,<br><br>　　　　　　　　Defendant. | Case No.: 19-CR-0838-GPC<br><br>**ORDER DENYING MOTION TO SUPPRESS STATEMENTS AND GRANTING MOTION IN LIMINE AS TO PRE-MIRANDA STATEMENTS.**<br><br>**[ECF Nos. 20, 30, 34.]** |

On May 24, 2019, Defendant Antonio Velasco-Esparza filed a motion to suppress post-*Miranda* statements taken by officers following his arrest at the Otay-Mesa border. ECF No. 20. On May 31, 2019, the Government filed a response. ECF No. 21. The Court conducted an evidentiary hearing on August 16, 2019. ECF Nos. 26, 29. Following the hearing, on September 6, 2019, Mr. Velasco-Esparza filed a supplemental motion to suppress statements made prior to the administration of *Miranda* warnings. ECF No. 30. On September 20, 2019, the Government filed a response. ECF No. 31. The Court then held an evidentiary hearing on the motions to suppress all of Velasco's statements on October 4, 2019. ECF Nos. 33, 35. After the hearing, the Government confirmed that it

1

did not intend to offer Defendant's post-*Miranda* statements in their case-in-chief, and the Court found that all of Defendant's statements taken by the officers were voluntary.

Because the prosecution has agreed not to offer any of Defendants' statement made during, after or while, he received *Miranda* warnings, the remaining question is whether Defendant's post-arrest, pre-*Miranda* statements are admissible under the booking questions exception. *See Pennsylvania v. Muniz*, 496 U.S. 582 (1990). Most recently, on November 8, 2019, the Government filed a motion in limine requesting, among other things, permission to admit Defendant's pre-*Miranda* statements at trial. ECF No. 34 at 5. For the following reasons, the Court finds that these statements are admissible, and **DENIES** Defendant's motions to suppress and **GRANTS** the Government's motion in limine.

## I. Factual and Procedural Background

### a. The Arrest

On February 11, 2019, at approximately 10:55 a.m., Antonio Velasco-Esparza ("Defendant") applied for admission to the United States at the Otay Mesa Port of Entry. Defendant drove alone to the Otay Mesa Port of Entry. While approaching the primary inspection area, a Customs and Border Protection ("CBP") dog alerted to Defendant's vehicle. A CBP Officer inspected the vehicle. During the inspection, another officer asked Defendant if the vehicle was his and if everything in it belonged to him. Defendant responded yes to both questions. He then told the officer that he was going home to San Diego. Defendant was arrested, and the vehicle was taken to secondary inspection.

In the secondary inspection area, Defendant's vehicle was scanned using the Z-Portal machine. After the vehicle was scanned, a third CBP officer identified "anomalies" in the vehicle's gas tank. A fourth CBP officer physically inspected the vehicle as a CBP contractor removed the gas tank. The gas tank was found to contain 25.74 kilograms of methamphetamine.

///

### b. The Interrogation Pre-*Miranda*

At approximately 3:00 p.m., Defendant was taken to a room at the Otay Mesa Port of Entry which had been converted from an old cell and contained a table, a bench, and a couple of chairs. (ECF No. 29, August 16, 2019 Hearing ("Aug. Hrg.") at 10.) Homeland Security Investigations Special Agents Mendoza and Salcedo joined Defendant there and explained that they were going to "go over some biographical information." (ECF No. 20-1, Ex. A, Interrogation Transcript ("Int. Tr.") at 2.) Agents Mendoza and Salcedo asked Defendant his name, date of birth, social security number, and address. (ECF No. 20-1, Int. Tr. at 1–2.) Among Defendant's responses, Defendant stated he had "barely moved out . . . to San Diego" and "honestly live[d] in San Jose." (ECF No. 20-1, Int. Tr. at 2.)

Defendant then informed the Agents that he "wan[ted] to talk to [his] lawyer." (ECF No. 20-1, Int. Tr. at 3.) Agent Mendoza ignored the request, repeating his question, "Okay. Um, well what's your address in San Jose?" (ECF No. 20-1, Int. Tr. at 3.) Mendoza continued to ask Defendant various questions from "ICE Form 73, a personal history report," (ECF No. 29, Aug. Hrg. at 7), including his place of birth, e-mail, weight, height, eye color, scars/tattoos, and employment. (ECF No. 20-1, Int. Tr. at 2–5.)

Agent Mendoza thereafter turned to inquire about Defendant's family. Mendoza asked for Defendant's parents' names, phone numbers, and addresses. (ECF No. 20-1, Int. Tr. at 5–7.) Mendoza clarified to Defendant that the questions were "just for biographical purposes." (ECF No. 20-1, Int. Tr. at 5.) As Defendant responded to Mendoza's questions, he provided some incriminating answers not directly responsive to Mendoza's questioning. In response to a question about his father's address, Defendant offered that his parents "have nothing to do, like, with this stuff, Bro, trust me," and that he was "the only stupid here (sic)." (ECF No. 20-1, Int. Tr. at 6.)

Mendoza next asked for Defendant's marital status and, upon learning he had a girlfriend and two children, inquired of Defendant's girlfriend's name, date of birth, phone number, and address as well as the children's names, ages, and primary residence (mother or father). (ECF No. 20-1, Int. Tr. at 5–7.) Defendant expressed some hesitation, asking do "[y]ou need those names?" (ECF No. 20-1, Int. Tr. at 7.) Defendant repeated, "You need, like the names, like, is there something, like, background or something?", to which Agent Mendoza responded, "it's not something bad, it's just, I'm just trying to get the information, background information on you." (ECF No. 20-1, Int. Tr. at 8.) Otherwise, Defendant answered Mendoza's questions.

At this point, Agent Mendoza asked Defendant about any alcohol and drug use. Specifically, Agent Mendoza asked Defendant how often and recently he drank alcohol, used drugs, or smoked. (ECF No. 20-1, Int. Tr. at 9–10.) Mendoza also asked Defendant how much money he had on him, as well as whether he had any medical conditions or took prescription medicine. (ECF No. 20-1, Int. Tr. at 10.)

### c. Questioning During and After *Miranda*

Once the agents completed the background questioning, Agent Mendoza read Defendant his rights pursuant to *Miranda*. (ECF No. 20-1, Int. Tr. at 11.) Defendant orally acknowledged that he understood each right, (ECF No. 20-1, Int. Tr. at 11), and signed a *Miranda* waiver form. (ECF No. 20-1, Ex. B.) Agent Mendoza subsequently asked Defendant several times if he waived his *Miranda* rights would he wish to speak with the Agents until Defendant eventually agreed. (ECF No. 20-1, Int. Tr. at 12–14). Defendant offered several incriminating remarks that were directly responsive to Mendoza's questioning.

After waiving his *Miranda* rights, Defendant gave a statement indicating that he had agreed to cross a car into California in exchange for $6,000. Defendant maintained that he did not know what was concealed within the vehicle. The Government is not

4

seeking to introduce any of Defendants statements made during or after the administration of *Miranda* warnings.

## II. Legal Standard

### a. The Booking Exception

In the seminal case of *Miranda*, the Supreme Court created a prophylactic protection to the Fifth Amendment: "the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." *Miranda v. Arizona*, 384 U.S. 436, 444 (1966).

Thirty-six years later, the Supreme Court exempted from *Miranda*'s protection responses to questions intended "to secure the biographical data necessary to complete booking or pretrial services." *Pennsylvania v. Muniz*, 496 U.S. 582, 601 (1990) (plurality opinion) (quotation marks omitted) (concluding that the answers to questions regarding the defendant's name, address, height, weight, eye color, date of birth, and current age were admissible in the absence of *Miranda* warnings). Because such questions "rarely elicit an incriminating response, routine gathering of biographical data does not constitute interrogation sufficient to trigger constitutional protections," *United States v. Gonzalez–Sandoval*, 894 F.2d 1043, 1046 (9th Cir. 1990), even if asked after a defendant has invoked the right to counsel. *See United States v. Zapien*, 861 F.3d 971, 975 (9th Cir. 2017) (per curiam).

The exception does not apply, however, to questioning "conducted for an investigatory purpose and not for the booking process," *United States v. Poole*, 794 F.2d 462, 466 (9th Cir. 1986) (as amended), or questioning that is "reasonably likely to elicit an incriminating response from the suspect," *United States v. Booth*, 669 F.2d 1231, 1237 (9th Cir. 1981) (quotation omitted). To account for the "potential for abuse by law enforcement officers who might, under the guise of seeking 'objective' or 'neutral'

5

information, deliberately elicit an incriminating statement from a suspect," *id.*, the Court has adopted an "objective" test. *Zapien*, 861 F.3d at 975 (citing *United States v. Washington*, 462 F.3d 1124, 1132 (9th Cir. 2006)). Under this test, "context" is key. *Zapien*, 861 F.3d at 975 (citing *United States v. Pacheco-Lopez*, 531 F.3d 420, 424–25 (6th Cir. 2008)). After all, "[e]ven a relatively innocuous question may, in light of the unusual susceptibility of a particular suspect, be reasonably likely to elicit an incriminating response." *Booth*, 669 F.2d at 1238.

In particular, the "relationship of the question asked to the crime suspected is highly relevant." *United States v. Mata-Abundiz*, 717 F.2d 1277, 1280 (9th Cir. 1983). For example, '[w]hile there is usually nothing objectionable about asking a detainee his place of birth, the same question assumes a completely different character when an INS agent asks it of a person he suspects is an illegal alien." *United States v. Henley*, 984 F.2d 1040, 1042 (9th Cir. 1993). Likewise, "when a defendant [is] charged with murder," their "unadmonished responses to questions about [a] gang affiliation" are protected by *Miranda*. *United States v. Williams*, 842 F.3d 1143, 1148 (9th Cir. 2016).

For a question to fall within the ambit of *Miranda*, the likeliness to produce an incriminating response should be objectively apparent when the question is asked. *United States v. Salgado*, 292 F.3d 1169, 1174 (9th Cir. 2002) (considering, as one factor, that defendant's "response became incriminating only after the passage of a substantial period of time"). Also, the "subjective intent of the agent is relevant but not conclusive." *United States v. Mata-Abundiz*, 717 F.2d 1277, 1280 (9th Cir. 1983). And, that an officer already knows the answer to the question asked does not necessarily show that officer seeks to elicit an incriminating response. *United States v. Washington*, 462 F.3d 1124, 1133 n.1 (9th Cir. 2006) ("A desire to confirm the information for booking purposes does not mean that the question constitutes interrogation.")

## III. Analysis

### a. The Pre-*Miranda* Questioning Falls Within the Booking Exception.

Defendant asks that the Court suppress all statements made during the pre-*Miranda* questioning on the basis that Agent Mendoza's questions "were far beyond the limited scope of biographical questions approved by the Supreme Court." (ECF No. 20 at 3.) The Court finds, to the contrary, that the questioning falls within the ambit of the booking exception for the following reasons.

As a threshold matter, the Court notes that the Government's reliance on ICE Form 73 is misplaced. (*Cf.* ECF No. 31 at 4–5.) Every court has a duty to examine each case under the booking questions exception in light of the specific circumstances and "context" attendant to it. *Pennsylvania*, 496 U.S. at 601–02; *Zapien*, 861 F.3d at 976 (considering both "the questions themselves and the context in which they were asked "). Thus, an agent's use of a form, even if standard and widely adopted, affords no talismanic protection to the questions they ask. *See United States v. Mateo*, 392 F. Supp. 3d 454, 466 (D. Vt. 2019) (rejecting questions from a U.S. Marshall form regarding "Defendant's siblings' names, addresses, dates of birth, and phone numbers" and "whether Defendant used drugs and drank alcohol" as likely "to elicit incriminating responses and . . . not needed for any administrative purpose"); *see also Rosa v. McCray*, 396 F.3d 210, 222 (2d Cir. 2005) (asking whether certain questions were "narrowly crafted by the officer to obtain information necessary to complete the booking form").

This is evident even here, with respect to ICE Form 73, as the Government concedes that the Agent's drug and alcohol questions are "somewhat closely related to the offense charged" and has declined to try to offer them at trial even though they take

place during the Agent's booking questions.[1] (ECF No. 31 at 5 n.2.) Also, as was true in *Mateo*, ICE Form 73 also contains a problematic section entitled "Criminal / Other Associates." (ECF No. 21-1, Ex. 2 at 2.); *Mateo*, 392 F. Supp. 3d at 466.

Turning to the instant issue, the Court nonetheless finds that the questions asked by Agent Mendoza – namely, "What's your address?" and "What part of Mexico [does your father live in]? Or do you know the address?", (ECF No. 20-1, Ex. A at 2, 6) – are not "reasonably likely to elicit an incriminating response" in this specific case. *Booth*, 669 F.2d at 1237. There is no apparent "relationship" between where Defendant lives, or his father's specific address, and the charge that Defendant imported methamphetamine. *Mata-Abundiz*, 717 F.2d at 1280. Neither location would increase Defendant's punishment were he to be found guilty, *see Williams*, 842 F.3d at 1148, nor clearly help the government in proving its burden a trial. *See Henley*, 984 F.2d at 1042. Moreover, that Defendant's non-sequitur responses are incriminating does not suggest otherwise. *Mitchell v. Lackner*, No. 13-1807-DMG, 2014 WL 5581371, at *6 (C.D. Cal. Oct. 31, 2014). And, the Agent's testimony that such questions had never, in his experience, elicited incriminating responses tends to support a finding that they are permissible as booking questions in this case. (ECF No. 29, Aug. Hrg. at 9, 15.)

In addition, though Defendant is right that "some of the information collected from the personal history report goes into the" Report for Investigation (ROI), the Court finds that this does not violate the booking exception here. (ECF No. 30 at 2.) Certainly, questioning "conducted for an investigatory purpose and not for the booking process" is not admissible under *Miranda*. *Poole*, 794 F.2d at 466. However, Agent Mendoza's testimony as to what goes in the ROI does not explicitly cover the statements which

---

[1] The Government asserts that Agent Mendoza asked questions related to Defendant's drug and alcohol use "to identify whether Defendant has [a] chemical dependency issue that could cause him to be rejected from the Metropolitan Correctional Center." (ECF No. 31 at 5 n.2.)

8

Defendant now challenges. (*See* ECF No. 29, Aug. Hrg. at 52, 55 (referring only to Defendant's "[c]ell phone number, e-mail, passport information.") Also, even assuming Defendant's responses are included in the ROI, those statements occurred in response to questions that had an objective booking purpose supported by the factual record. First, the Agent asked for where Defendant lived because that information is necessary to "pretrial services." *Pennsylvania*, 496 U.S. at 601. Second, as Agent Mendoza testified, the Agents asked about Defendant's parents to obtain their "emergency contact information."[2] (ECF No. 29, Aug. Hrg. at 15.) The Government persuasively argues that, given Defendant's status as a citizen, and the cross border lives of many San Diego residents, the fact that Defendant's father resides in Mexico does not necessarily "negate his ability to serve as an emergency contact." (Transcript of Oct. Hrg. at 15.)

The Court also finds that there is nothing in the record to suggest Defendant was especially susceptible to the Agents' questioning. Defendant did not appear "sick or ill," is not a minor, was not "under the influence of narcotics" or "alcohol," and showed no signs of "low intellectual functioning." (ECF No. 29, Aug. Hrg. at 36–37.) At most, Defendant asserts that he was detained for four hours before the interrogation, and that he asked for an attorney prior to incriminating himself. (ECF No. 30 at 4–5.) This, however, does make the Defendant especially susceptible. *Zapien*, 861 F.3d at 976.

The Court finds that Defendant's additional contentions do not merit an alternate result. With respect to Agent Mendoza's conduct, for example, Defendant argues that the Agent's decision to ignore Defendant's invocation and then offer to speak to the prosecutor on his behalf "make clear that he [was] seeking information that is beyond

---

[2] Notably, Agent Mendoza asked for multiple people's contact information – Defendant's father, mother, and girlfriend. It is not clear why, if Defendant provided enough information to contact the first named person, Agent Mendoza would need to ask for a second or third emergency contact. This is a moot point here as Mendoza first asked for Defendant's father's contact information, and in response Defendant made the incriminating statement.

9

biographical." (ECF No. 30 at 3.) However, that speculation is belied by Agent Mendoza's conduct. Mendoza had multiple opportunities to probe Defendants' unsolicited, incriminating statements and chose not to do so. Similarly, Mendoza testified that he does, in fact, "tell the U.S. Attorney" when he thinks "defendants give truthful statements," and knows that he cannot "make any promises." (ECF No. 31, Aug. Hrg. at 31.) The Court is persuaded that Agent Mendoza's offer, while it may wear on the Defendant, does not evince an intent to "elicit an incriminating statement" "under the guise of seeking 'objective' or 'neutral' information." *Booth*, 669 F.2d at 1237. Also, even if Agent Mendoza learned some information about Defendant from the CBP officers at the primary inspection, Ninth Circuit precedent states that his decision to question Defendant about that information does not trigger *Miranda*. *Washington*, 462 F.3d at 1133 n.1 ("A desire to confirm the information for booking purposes does not mean that the question constitutes interrogation."); (*cf.* ECF No. 30 at 4.)

Defendant also endeavors to distinguish the Government's most salient precedent, *Zapien*, to show that it is not dispositive here. (ECF No. 30 at 3–4.) Defendant notes that Mr. Zapien received *Miranda* warnings and chose to re-initiate conversation with the agents before making an incriminating statement. *Zapien*, 861 F.3d at 973. In contrast, here, Defendant's statements were made prior to any *Miranda* warnings, and directly in response to the alleged booking questions. *Id.* While this is true, it does not change the fact that, on the whole, Agent Mendoza's questions were not objectively likely to elicit an incriminating response in this scenario. And, of course, the Government is correct that *Zapien* shows booking questions may succeed an invocation. (ECF No. 31 at 6); *Zapien*, 861 F.3d at 976; *United States v. Velarde-Lopez*, 54 F. App'x 265, 267 (9th Cir. 2002).

Thus, the Court finds that Agent Mendoza's questioning during the first 9 minutes of the interrogation, (ECF No. 20-1, Ex. A, 1–9), falls within the booking questions exception to *Miranda* and Defendant's responses are admissible.

### b. The Defendant's Statements Were Voluntary.

While the Court provided an oral ruling on October 4, 2019 that the Defendant's statements to interviewing officers were voluntary, the Court herein supplements its earlier decision with the following discussion and analysis.

Defendant argues that the Agents' conduct and the circumstances in totality functioned to overbear Defendant's will. (ECF No. 20 at 5.) Defendant points to the facts that: there were two officers; Defendant was under arrest; Defendant lacked counsel; Defendant's invocation was ignored; and the Agent "represent[ed] that he could favorably influence the outcome of the case by writing to the judge and speaking to the prosecutor" if Defendant told the "truth." (ECF No. 20 at 5.)

In response, the Government asserts the contrary: "[a]ll of the evidence supports a finding a voluntariness." (ECF No. 31 at 8.) The Government posits that Defendant did not appear sick, was not threatened, did not appear under the influence of narcotics or alcohol, did not appear low functioning, did not ask to stop the interview or complain about the interview's conditions, and was not handcuffed. (ECF No. 31 at 8–9; ECF No. 29, Aug. Hrg. at 12, 36, 37.) The Government also notes that the Agents did not raise their voices during the interview, were not armed, and wore plain clothes. (ECF No. 31 at 9; ECF No. 29, Aug. Hrg. at 12, 37.) The Government further asserts that neither agent pressured Defendant, both agents were calm, the interview lasted approximately 35 minutes in total, and Defendant both orally, and by completing the waiver form, knowingly waived *Miranda*. (ECF No. 21 at 10, 12–13; ECF No. 20-1, Ex. B.)

"A confession is involuntary if coerced either by physical intimidation or psychological pressure." *United States v. Haswood*, 350 F.3d 1024, 1027 (9th Cir. 2003). The Court examines this by asking "whether the defendant's will was overborne at the time he confessed." *United States v. Crawford*, 372 F.3d 1048, 1060 (9th Cir. 2004) (en

banc). The government bears the burden of proving that a confession is voluntary by a preponderance of the evidence. *Colorado v. Connelly*, 479 U.S. 157, 168 (1986). "Voluntariness depends on such factors as the surrounding circumstances and the combined effect of the entire course of the officers' conduct upon the defendant." *Henry v. Kernan*, 197 F.3d 1021, 1026 (9th Cir. 1999).

Here, the Court cannot say that Defendant's statements were involuntary. The Agents "advised [Defendant] of his rights both verbally and in writing," *United States v. Lacey*, 225 F. App'x 478, 480 (9th Cir. 2007), "and were polite and respectful." *United States v. Barboza*, 399 F. App'x 312, 313 (9th Cir. 2010). Agent Mendoza's offer to help the Defendant also "does not render a subsequent statement involuntary," *United States v. Leon Guerrero*, 847 F.2d 1363, 1366 (9th Cir. 1988) (citations omitted), nor did his references to Defendant's family rise to the level of a *Tingle* violation. *See United States v. Tingle*, 658 F.2d 1332, 1334 (9th Cir. 1981) (finding confession involuntary where "[i]n an effort to obtain a confession, [the officer] told [the defendant] either that she would not see [her two-year-old] child for a while if she went to prison").

In sum, while Defendant is correct that two officers wearing visible badges interrogated him, Defendant's condition is indistinguishable from most people taken to secondary inspection at the Port of Entry. (ECF No. 29, Aug. Hrg. at 42.) Consequently, because Defendant's declaration was stricken, (ECF No. 20-1, Ex. C; ECF No. 29, Aug. Hrg. at 59), and Defendant introduced no other witnesses or exhibits, there is no evidence to contradict the prosecution's assertion of voluntariness except the fact that the Agents engaged in the booking questions after Defendant's invocation. On these facts, the Court finds that the prosecution has proven Defendants' statements were voluntary.

### IV. Defendant's Post-Miranda Statements

Finally, Defendant's statements following the booking questions are not admissible in the Government's case-in-chief. If "a suspect requests counsel at any time during the

interview, he is not subject to further questioning until a lawyer has been made available or the suspect himself reinitiates conversation." *Davis v. United States*, 512 U.S. 452, 456–57 (1994); *see Edwards v. Arizona*, 451 U.S. 477, 485 (1981). And, a Defendant cannot re-initiate the conversation if the questioning never stops. *See United States v. Rosenschein*, 369 F. Supp. 3d 1147, 1158 (D.N.M. 2019). The Government has stated that it does not intend to offer these statements in it case-in-chief. As such, the motion to suppress these statements is DENIED as MOOT.

## V. Conclusion

Considering the foregoing reasons, the Court finds that Defendant's statements uttered during the first nine minutes of his post-arrest interrogation are admissible under the booking questions exception. The Court also finds that Defendant's statements made after the Agents afforded him *Miranda* warnings are voluntary.

Defendant's Motion to Suppress Post-*Miranda* Statements in the Government's case-in-chief is DENIED as MOOT, Defendant's Motion to Suppress Pre-*Miranda* Statements is DENIED, and the Government's motion in limine to admit Pre-*Miranda* Statements is GRANTED.

**IT IS SO ORDERED.**

Dated: December 18, 2019

Hon. Gonzalo P. Curiel
United States District Judge